HAROLD ZELTNER AND MAXWELL J. GOLDBERG, PLAIN-
TIFFS, v. LOUIS F. WATSON, SUPERINTENDENT OF
BUILDINGS OF THE CITY OF ATLANTIC CITY, DE-
FENDANTS.

Superior Court of New Jersey
Law Division

Decided May 24, 1951.

*Mr. B. Louis Blumberg,* for the plaintiffs.

*Mr. Murray .Fredericks,* for the defendant.

Woods, J. S. C. In lieu of the prerogative writ of *mandamus, Rule* 3 :81–1, plaintiffs filed their complaint asking this court to command the superintendent of buildings of the City of Atlantic City to issue a building permit to them for the erection of a one-story building at the corner of Roosevelt Place and the Boardwalk, Atlantic City, New Jersey. The location is in Business Zone No. 2. Counsel waived and cured certain irregularities in procedure and the matter came for a hearing on application by the plaintiffs for a summary judgment. This application was denied and the court ruled that facts were in dispute and that testimony should be taken. Prior to the taking of testimony, the court held a pretrial of the controversy and merged the issues set up in the complaint and answer as contemplated to be filed.

Application for a permit was made by the plaintiffs to the superintendent of buildings, Louis F. Watson, on March 27, 1951. This application was denied April 5, 1951. There appears from the testimony introduced, that with the application for the permit were presented plans and specifications. These were introduced in evidence. Plaintiffs proposed the erection of a soda fountain and a luncheonette. The facade of this building is sketched to show the front with its two large windows and its two sliding, overhead doors. These are shown in the plan marked "Boardwalk Elevation." To the other appointments set forth in the blueprints and testified to, we need not allude except to say that no objections are raised by the City of Atlantic City or by its superintendent of buildings as to construction regulations, but rather to the purpose to which the structure is to be dedicated, and to the fact that he, the superintendent, received protests remonstrating against such a building for the purpose of operating a soda fountain and luncheonette.

Counsel for the defendant argues that to permit the construction of the building contemplated would be a violation of the Atlantic City Zoning Ordinance as passed November 29, 1929, and as amended: Ordinance No. 9, May 16, 1940. The amendment referred to reads, in part, and we quote the part pertinent to the case before us:

"Section VI. Use Regulations Controlling Business Zones No. 2 and Business Zones No. 3. In Business Zones Nos. 2 and 3, no building or premises shall be used, and no building shall be erected or altered which is arranged, intended or designed to be used for any of the following specified trades, industries or uses: * * *
"19. Lunch cars or wagons, pullman diners."

Counsel for the defendant argues that the proposed design and construction are important and recites:

"The proposed building is a one-story structure which will stretch forty-two (42) feet along the Boardwalk and is twenty-six (26) feet deep. It will contain counters; one counter nineteen (19) feet six (6) inches in length will parallel the Boardwalk, and another counter sixteen and one-half (16½) feet in length will be constructed at right angles to the Boardwalk. On the front of the building will be two overhead doors and two sliding windows. The overhead doors can be raised and recessed into the ceiling, and the sliding windows may be opened. The construction of the building shows an evident intent, arrangement and design for an open-front operation for sale of the food, hot dogs, soft drinks and other related items to strollers and passer-by on the Boardwalk. From the facts as they appear in this case, it is evident and apparent that the building will be devoted to the sale of food."

He further contends:

"The explicit wording of the ordinance prohibits the erection of any building which is arranged, intended or designed for use as a lunch car or wagon, etc. The ordinance is directed to the use to which the proposed building will be devoted. That the building in question by construction, design, arrangement and intent is to be devoted to the same uses as a lunch car is beyond question."

The court agrees that the use of lunch cars have been judicially recognized in New Jersey. Counsel refers to *Hart v. Teaneck Township*, 134 *N. J. L.* 422, 48 *A. 2d*, 750 (*Sup. Ct.* 1946), and quotes certain language there relative to "regulation," "loud noises of patrons," "rattling of dishes"

—tending to the "discomfort and disturbance of nearby residents." In brief, here the court held that lunch cars "form a proper class for legislation as distinguished from the ordinary type of restaurant," and concluded that the ordinance was not discriminatory. This case went before the Court of Errors and Appeals, 135 *N. J. L.* 174, 50 *A. 2d* 856 (1947), and Justice Wachenfeld, delivering the opinion, said:

"The instant ordinance is discriminatory and unreasonable in failing to include within its terms other establishments in the nature of restaurants."

On the discriminatory angle, the original judgment was reversed. Of course, we do not hold this to be the finding here, but we are impressed with this part of the opinion, which reads as follows:

"Lunch wagons as purveyors of food do not differ substantially from restaurants in general. The method of service or the structure itself may induce a more informal atmosphere, but that can hardly be the basis for the distinction sought to be made. There is nothing peculiar to this type of establishment from which these annoyances arise. Rather, they are founded in the late hours and probably would occur at all eating places remaining open during that period."

The case before us assumes a different aspect. Plaintiffs plan to use this building as a soda fountain and luncheonette. Counsel have not presented any cases touching upon the design here planned or proposed. For the defendant, counsel cites the case of *Keystone Lunch, Inc. v. First Criminal Court, Newark,* 22 *N. J. Misc.* 82 (*Sup. Ct.* 1944). This realistically was a "lunch wagon" or "car." It remained such even after enclosure, and as the court aptly stated "a 'lunch wagon' is a 'lunch wagon,' whether it is in a shell or out of a shell, particularly if the shell continues to have the original apertures for light and access." No luncheonette cases have been cited. Also, under the Ordinance No. 9, a soda fountain or a luncheonette is not banned.

In view of the fact that we have no New Jersey cases cited, we seek for guidance in our conclusions to outside of the

state cases. The case of *Rialto Luncheonette, Inc. v.* 1481 *Broadway Corporation,* 11 *N. Y. S. 2d* 39, 170 *Misc.* 754 may help us. This case distinguishes the luncheonette from a restaurant. (And by the way, the restaurant under the Atlantic City Ordinance No. 9, does not appear to be prohibited). In the above case, the court declared:

"The terms 'luncheon' and 'luncheonette' have acquired distinctive meanings as places for the serving of foods. The term 'food' seems to imply solid material such as meat, bread, etc. 'Luncheonette' is a 'lunch (a) a light meal eaten between breakfast and dinner, a luncheon (2) U. S. a light repast between meals, and is derived from the English (Diet) word meaning a lump.' A 'luncheonette' is a place for the serving of light lunches, 'lunches' being commonly known as the service of solid foods between breakfast and dinner."

"The luncheonette * * * is a lineal descendant of the Coffee Pot, a product of the * * * days of prohibition, which sprang into existence when a great number of restaurants and eating houses of note closed during that era. They were inaugurated for the purpose of supplying light meals or what is known in the restaurant trade as 'short orders.' The luncheonette logically followed in business centers to supply the light mid-day meals formerly obtained in restaurants."

Here the testimony of witnesses and admissions of counsel reveal the desire to sell soft drinks, dairy products, serve candies, ice cream, sodas, sundaes, "hot dogs" and "hamburgers," but no meals. The building to which customers or patrons will go is a luncheonette by design and not a "lunch wagon," a "lunch car" or a "pullman car,"—all of which are, strictly speaking, vehicles standing or moving on wheels, or by design capable of being so moved. "A car" has been said to be a word of many meanings. The sense in which it is used in a particular instrument depends upon the context and purpose thereof.

"In common parlance, the word is sometimes used in a generic sense, and is not confined to any specific kind of conveyance, while at the other times, it has been used as specifically referring to a particular vehicle, as an automobile, or a hackney carriage. The primary meaning of the word has been said to be a wheeled vehicle or conveyance, a carriage, cart, wagon, truck, etc., or any vehicle

primarily intended for the transportation of persons or freight. * * * Whether a vehicle can properly be classified as a car is not determined by the manner of its propulsion, or by its speed." 12 *C. J. S. page* 1139.

Webster defines a car as a "small vehicle moved on wheels, either four wheeled or two wheeled, but, usually the latter, drawn by a single horse—a vehicle mounted on tracks for use on a railroad; a vehicle for running on rails."

The luncheonette in question will have an ell counter and tables for customers' use. The building is not designed for winter occupancy. It will have no chimney, but its foundation will be on reinforced concrete piling. It will have concrete walls finished in stucco, with interior lined in knotty pine over masonry. It will have a flat asphalt roof. In short, it will have no wheels making it capable of being moved as a vehicle on wheels.

Two protests have been filed. A realtor testifies that it will tend to cheapen the area. A member of the planning board says it will have a tendency to attract persons in the lower social scale; that the community consists chiefly of apartment houses and is essentially residential, but that there are business places in this area and, admittedly, the area is not strictly residential. In fact, even restaurants are not prohibited and the ordinance provides "No use permitted in a resident zone or in a Business Zone No. 1 shall be excluded from a Business Zone No. 2 or No. 3."

The defendant sets up the defense of "nuisance." At the most, this is prospective. A soda fountain and a luncheonette cannot be regarded as a nuisance *per se*.

Ordinance Amendment No. 35 has been assigned by counsel for the defendants in opposing the granting of the permit to build. This point was advanced subsequent to the pretrial, but on motion was, without opposition from the plaintiff's attorney, made a part of the pretrial order or to be considered as such. The ordinance, as amended August 11, 1938, reads:

"BE IT ORDAINED by the Board of Commissioners of the City of Atlantic City.

Section 1. That Section 5 of the ordinance referred to in the title of this ordinance and to which this ordinance is amendatory be and the same is hereby amended by adding a subdivision to be designated as subdivision 10 to follow immediately after subdivision 9 of said section and to read as follows:

'10. Open stand for the sale of food or other commodity used or intended for immediate human consumption.'

Section 2. That Section VI of the ordinance referred to in the title of this ordinance and to which this ordinance is amendatory be and the same is hereby amended by adding a subdivision to be designated as subdivision 21 to follow immediately after subdivision 20 of said section and to read as follows:

'21. Open stand for the sale of food or other commodity used or intended for immediate human consumption.'

Section 3. That this ordinance shall take effect immediately after its final passage and publication."

The pertinent part is that which refers to Section VI, which covers Business Zones Nos. 2 and Business Zones Nos. 3, but counsel overlook the fact that Ordinance No. 9, passed May 16, 1940, apparently was a complete revision of Section VI and omits "open stands." The court, therefore, must find the same inoperative under the evidence before it. But should the court be under a misapprehension as to this fact, suffice it will be to state that there is no definition in the ordinance and in any of the cases that have been either presented by counsel in memorandum or found by the court in its research to bring "open stand" within the meaning or intendment of the ordinance.

■ From the foregoing the court must conclude that plaintiffs, despite protests, and in view of the ordinance as it now reads, should not be refused a permit in the premises; that the building planned to be erected as a soda fountain and luncheonette is not arranged, intended or designed to be used as a "lunch car or wagon," or a "pullman car," or an "open stand"; and that the defendant, Louis F. Watson, superintendent of buildings, should grant the permit requested forthwith.