85 N.J. Super. 267 (1964)
204 A.2d 592
NORMAN A. MASTERSON (AND 50 OTHERS), PLAINTIFFS-RESPONDENTS,
v.
CHRISTOPHER DINER, INC., ETC., AND MICHAEL CHRISTOPHER, DEFENDANTS-APPELLANTS, AND FRANK RUBINO, SR., ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 19, 1964.
Decided October 27, 1964.
*268 Before Judges GOLDMANN, SULLIVAN and LABRECQUE.
Mr. Alan Goldstein argued the cause for appellants (Messrs. Gruen & Goldstein, attorneys).
Mr. Bernard Warren Hehl argued the cause for plaintiffs-respondents Masterson et al. (Messrs. McKenzie & Hehl, attorneys).
Mr. Donald G. Kein argued the cause for defendant-respondent Giacona, Union Township Building Inspector (Messrs. Kein, Scotch & Pollatschek, attorneys).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Defendants Christopher Diner, Inc. and Michael Christopher, individually, appeal from a summary judgment entered in favor of plaintiffs in the Law Division which reversed the decision of the Union Township *269 Board of Adjustment granting defendants permission to receive a building permit for a diner-type restaurant. The court also directed the township inspector to revoke the permit he had issued after the board handed down its decision.
Christopher Diner, Inc. and Michael Christopher had applied to the building inspector for a permit to erect a diner at Chestnut Street and Tucker Avenue in Union Township. The lot in question is five-sided, with a 186.32' frontage on Chestnut Street, a 178.62' frontage on Tucker Avenue, and the other three sides measuring 100', 99.5' and 89.91'. The proposed structure will occupy 15% of the area, the rest being devoted to plantings and parking. The intention of the applicants is to move their existing stainless steel diner, measuring 33'4" x 50', from Central Avenue, Newark, and install it on a 12" thick masonry foundation, the cellar being 7'6" deep. They also propose to build a 17'4" x 50' kitchen addition as a permanent installation, so that the final structure will measure 50'8" x 50'. The building will be permanently connected to all necessary utilities. The installation cost will be between $35,000 and $40,000 and, adding the cost of the diner itself, the new structure will have a value in excess of $200,000. It will seat 100 people and feature as complete a menu as restaurants offer.
The building inspector refused to issue a permit for the diner-restaurant because he considered it a violation of Article VII, paragraph 3, and Article VIII, paragraph 1, of the township zoning ordinance. Christopher and the corporation then appealed to the board of adjustment, seeking relief under N.J.S.A. 40:55-39(a) which empowers the board to hear and decide appeals where error is alleged in any order, requirement, decision or refusal made by an administrative official in the enforcement of a zoning ordinance. In the alternative, they sought a variance under N.J.S.A. 40:55-39(d), which authorizes the board to recommend to the governing body, in particular cases and for special reasons, the grant of a variance to allow a structure or use in a district restricted against such structure or use. This application for a variance *270 was definitely abandoned at the hearing before the board of adjustment.
Union Township's zoning ordinance was adopted in 1929, and the sections hereinafter referred to have remained unchanged. The premises in question are located in a business B district. Article VIII provides that in any such district no building or premises shall be used, and no building shall be erected or altered, which is arranged, intended or designed to be used except for one or more of the following purposes or uses:
"1. Any use permitted pursuant to * * * Article VII., relating to Business `A' Districts."
Article VII permits the following uses in a business A district, in addition to retail stores:
"3. Banks and fiduciary institutions; offices, business or vocational schools; personal service establishments, such as tailor shops, shoe or cobbler shops, barber shops, beauty parlors, restaurants or other eating places, not, however, including lunch wagons and not including dining cars." (Italics ours)
In denying the requested permit the building inspector obviously considered the proposed structure to be a lunch wagon or dining car, rather than a "restaurant or other eating place."
The main witness at the hearing before the board of adjustment was appellants' expert, James Montano, who has designed and sold diners for some 20 years. He was familiar with appellants' proposed structure and operation, as well as similar operations in the township, having designed and built some of the dining facilities there. He explained that a lunch wagon was originally a horse-drawn vehicle, moving from location to location to serve, primarily, coffee and doughnuts to workers. In the case of railroad workers, this operation was eventually transferred to some abandoned railroad car from which a limited menu was served. In time the lunch wagon was replaced by the familiar diner of over 20 years ago, most of whose operations and equipment were within full view of *271 the customers. After awhile food preparation was moved to a space in the back, the front area being devoted primarily to seating the public. Eventually there emerged the present-day luxury diner-type restaurant, whose menu was significantly different from that offered by the lunch wagon and dining car of another day  a menu equal to those found in good restaurants  and whose cooking, refrigeration and sanitary facilities are of the standard and arrangement found in such restaurants. The transition to the luxury diner came after World War II. In Montano's opinion, appellants' proposed structure definitely fell into the classification of restaurants rather than lunch wagons and dining cars.
On cross-examination Montano stated that the Christopher diner would be brought from Newark to Union Township in three sections (defendant Christopher said two, each 17' x 50'), carried on riggers' equipment specially designed for the transportation of such units. In answer to a specific inquiry by counsel for plaintiffs, Montano said that the lunch wagon had gone out of existence in the mid-1920's, and the dining car, or old-time diner, had continued down to the early '40's.
Direct examination of the building inspector elicited the information that the Venus Diner is located in the business B district. The Town and Campus Diner and the Peter Pan Diner are also in the area. (Other testimony had established the existence of a White Tower "short-order" operation, directly adjacent to the premises.) Counsel's attempt to determine whether a permit or license had ever been denied these diners was objected to, and the objection sustained. However, the fact that they exist and are in full operation was not controverted. It appears that it was only when the present application for the Christopher diner was presented that the alleged prohibition of the zoning ordinance was invoked by the building inspector.
In holding that the applicants were entitled to a building permit under N.J.S.A. 40:55-39(a), the board of adjustment made the following factual findings:
*272 "The ability to move the structure from one site to another site well removed from the original location does not mean that it is not a permanent installation. This structure is not any more transportable than a residence, commercial or industrial structure of similar size.
The term diner is widely used and may refer to other types of structures such as buildings entirely constructed on the site. The structure contemplated includes a permanent basement and one story kitchen addition with all the necessary facilities as to sanitation, waste disposal, garbage removal, lavatories, etc.
The plans as filed appear far more in the category of a diner-restaurant rather than a lunch wagon or diner car. The unit is not transportable as one unit but must be disassembled and reconstructed on the site. It does not contain the facility for mobility.
Article VII, disallows lunch wagons or dining cars in a Business A. zone. Business A., uses are allowed in Article VIII Business B. zones, but in the latter zone there is no prohibition against lunch wagons and dining cars. The term as used in the ordinance remains as drafted in 1929 and no longer fits present terminology as applied to a modern, permanent diner-restaurant. The Business B., zone allows restaurants and eating establishments and it is hereby held that diner-restaurant and eating establishment are interchangeable terms when all conditions of the applicant's case are considered."
The board found these findings sufficient reason for reversing the decision of the building inspector, and it therefore directed that he issue a permit forthwith.
Plaintiff Masterson and a number of other residents and property owners in the area of Chestnut Street and Tucker Avenue then filed a complaint in lieu of prerogative writs in the Law Division. They alleged that the board acted in an arbitrary, capricious and unreasonable manner, contrary to the zoning ordinance and statutes; that there was not sufficient proof for "the granting of such variance" (sic); and that the action taken by the board substantially impaired the "zoning structure" and would cause irreparable harm to plaintiffs. The complaint further stated that the building inspector, pursuant to the board decision, had issued a building permit and that defendants had commenced construction. Plaintiffs demanded judgment reversing the action of the board, restraining defendants from establishing and maintaining the "dining car" upon the premises in question, and directing the building inspector to withdraw his permit.
*273 The matter came before the Law Division on cross-motions for summary judgment. The parties were in full agreement that the case was one which had been determined by the board under, and which came within, section (a) of N.J.S.A. 40:55-39. Counsel for plaintiffs argued that the fact which distinguished the Christopher diner from a restaurant was its mobility  it was being moved by riggers from Newark to the new foundation. He put great emphasis upon an ordinance to license and regulate lunch wagons, which the township committee had passed in 1932, three years after the zoning ordinance, and to which we will refer shortly. He also maintained that the case was controlled by Keystone Lunch, Inc. v. First Criminal Court of Newark, 22 N.J. Misc. 82, 35 A.2d 472 (Sup. Ct. 1944), and Zeltner v. Watson, 14 N.J. Super. 127 (Law Div. 1951). In his view, the lunch wagon and dining car should be considered as the "grandparent or parent" of the structure which Montano and the applicants put in the class of a luxury diner-type restaurant.
In ruling in plaintiffs' favor the Law Division judge stated that he felt that the proposed dining facility was a movable structure, since the dining section could be moved from Newark to the new location in Union Township. Despite the fact of such permanent features as the kitchen addition, cellar and foundation, he still considered it a lunch wagon or dining car within the contemplation of the zoning ordinance. This appeal followed.
The principle is too well established to require any citation of authority that the factual findings of a board of adjustment are presumptively correct. Its familiarity with the site and the proposed dining facility, and its knowledge of the purposes to be served by the ordinance, are entitled to great weight, absent a clear abuse of discretion or error in law. The board of adjustment rejected plaintiffs' contention that the proposed diner-restaurant contained "the facility for mobility." It found the structure no more transportable than a residential, commercial or industrial structure of similar size. The board considered the dining establishment as far more a *274 diner-restaurant than a lunch wagon or dining car. These latter terms, appearing in the zoning ordinance and unchanged since 1929, could not be applied to a modern, permanent diner-restaurant.
(In passing, we do not agree with the board's legal conclusion that there is no prohibition against lunch wagons and dining cars in a business B district, merely because they are not expressly prohibited therein. Article VIII, section 1, relating to business B district uses, expressly states that a use permitted by Article VII, relating to business A districts, is permitted in a B district. Article VII, paragraph 3, as we have seen, prohibits lunch wagons and dining cars, but allows "restaurants or other eating places.")
"Lunch wagon" and "dining car" plainly bring to mind a vehicle  a dining facility mounted on wheels. Plaintiffs' witness Montano, whose expertise in the field was not challenged, clearly pointed out that this was the particular nature of these former dining facilities, which had respectively gone out of fashion in the mid-'20's and early '40's. The fact that they had wheels gave them complete mobility. Such was not the case, he said, with the dining facility proposed by defendants-applicants. We may judicially take notice of the fact that lunch wagons and dining cars were a common sight in former days, whereas now they have almost entirely disappeared.
The ordinance, as we have said, was passed in 1929, when dining cars and lunch wagons existed. It is reasonably to be inferred that the local legislative intent was to exclude them from business A and B districts. Their very mobility carried the potential of troublesome regulatory problems. It is for this reason that they were prohibited. Indeed, this purpose was carried out in the ordinance licensing and regulating lunch wagons, passed by the township committee in 1932. Section 1 defined "lunch wagon" to be "a movable structure or car intended for or devoted to restaurant purposes, and erected, constructed or maintained upon a wagon, chassis or other foundation." (Emphasis supplied) Applications for *275 the operation or maintenance of lunch wagons had to be made to the township committee, and the license therefor issued by the township clerk at an annual fee of $10. Section 6 of the ordinance required the licensee to place his lunch wagon on a substantial foundation and connect it with necessary public utilities; the outside construction of the lunch wagon was to be of metal or of other noninflammable material, and the surrounding grounds were to be planted so as to make for an attractive site. Plaintiffs' reliance upon the lunch wagon ordinance is therefore misdirected; the ordinance lends support to defendants' contention that their proposed structure is a restaurant or other eating place, a permitted use under the zoning ordinance.
In Keystone Lunch, Inc. v. First Criminal Court of Newark, above, on which plaintiffs rely, the Keystone diner was not of a class with defendants' proposed structure. It was described by the court as a roadside diner, "so common nowadays." It was a lunch wagon which the owner proposed to enclose in a concrete outer wall about 3'4" high, described by the court as "a sort of shell" which did not alter the original structure. The court held this to be a "lunch wagon," a prohibited use under the Newark zoning ordinance. The Keystone structure bears little resemblance to the one here under consideration, with its permanent foundation, cellar and utility connections, its permanent kitchen, and its offering of full course meals comparable to those found in better class restaurants. There will also be an extensive parking area and attractive landscaping.
Plaintiffs further rely upon Zeltner v. Watson, above, which involved the proposed erection of a one-story soda fountain and luncheonette on the Atlantic City Boardwalk. The zoning ordinance did not permit "lunch cars or wagons, pullman diners." After discussing and distinguishing the Keystone Lunch case, the court said:
"* * * The building to which customers or patrons will go is a luncheonette by design and not a `lunch wagon,' a `lunch car' or a `pullman car,'  all of which are, strictly speaking, vehicles standing *276 or moving on wheels, or by design capable of being so moved. `A car' has been said to be a word of many meanings. The sense in which it is used in a particular instrument depends upon the context and purpose thereof."
The primary meaning of "car," said the court, is "a wheeled vehicle or conveyance." It then went on to describe the proposed structure:
"The luncheonette in question will have an ell counter and tables for customers' use. The building is not designed for winter occupancy. It will have no chimney, but its foundation will be on reinforced concrete piling. It will have concrete walls finished in stucco, with interior lines in knotty pine over masonry. It will have a flat asphalt roof. In short, it will have no wheels making it capable of being moved as a vehicle on wheels."
The court concluded that plaintiffs, in view of the ordinance as it then read, should not be refused a permit, and that the building to be erected was not arranged, intended or designed to be used as a "lunch car or wagon" or a "pullman car." The superintendent of buildings was directed to grant the requested permit forthwith.
Compare Application of Dengeles, 1 Misc.2d 692, 148 N.Y.S.2d 92 (Sup. Ct. 1955), reversed on other grounds 3 App. Div.2d 758, 160 N.Y.S.2d 83 (App. Div. 1957), where the court held that a diner was a restaurant within the meaning of the Hempstead zoning ordinance which permitted restaurants in a business district; and Miami Beach v. Royal Castle System, Inc., 126 So.2d 595 (Fla. D. Ct. App. 1961). The Dengeles court held that zoning laws which curtail and limit uses of real property must be given a strict construction since they are in derogation of common law rights, and the provisions thereof may not be extended by implication, quoting from City of Albany v. Anthony, 262 App. Div. 401, 28 N.Y.S.2d 963 (App. Div. 1941). And see 8 McQuillin, Municipal Corporations (3d ed. 1957), § 25.72, p. 160 et seq.; Maplewood v. Tannenhaus, 64 N.J. Super. 80, 89 (App. Div. 1960).
The proposed Christopher dining facility has no greater mobility (a matter strongly stressed by plaintiffs and by the *277 trial judge) than any building of similar dimensions and construction  a prefabricated structure erected on a concrete slab, for example. Nor can it be considered a "short order" place of the lunch wagon or dining car type, which did not serve meals and were not equipped with kitchens or dining rooms capable of preparing or serving meals to customers. On the contrary, we consider the proposed structure as clearly falling within the class of "restaurants or other eating places" permitted in the business A and B districts of the township.
The judgment under appeal is reversed and the building permit reinstated.